

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

CNR:MPR
F. #2012R01666

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 19, 2014

By Hand and ECF

The Honorable Sandra J. Feuerstein
United States District Court
Eastern District of New York
1014 Federal Plaza
Central Islip, New York, 11722

   Re: United States v. Eduard Munteanu
     Criminal Docket No. 12-698 (S-1) (SJF)

Dear Judge Feuerstein:

  The government respectfully moves for in limine rulings regarding certain evidence that it intends to offer in its case-in-chief at the above-referenced defendant's trial scheduled to begin on October 6, 2014. Specifically, the government seeks admission of the defendant's narcotics-trafficking activities prior to the start date of the charged conspiracy as direct evidence of that conspiracy or, in the alternative, pursuant to Federal Rule of Evidence 404(b). In addition, the government seeks admission of excerpts of certain consensually recorded phone calls made by the defendant during the charged conspiracy and while he was incarcerated at Nassau County Correctional Center, as well as certain phone calls and text messages intercepted pursuant to a state court-authorized wiretap. The government respectfully requests a status conference on October 1, 2014 at 10:30 a.m. to address these motions. The government reserves its right to make additional motions in limine as necessary prior to trial.

I. Background

  Count Two of the Superseding Indictment charges that, in or about and between September 2012 and October 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant Eduard Munteanu, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved 500 grams or more of a substance containing cocaine, a Schedule II controlled substance, contrary to T. 21, U.S.C., § 846.

At trial, the government intends to offer evidence establishing that, in late August and early September 2012, the defendant withdrew a substantial amount of cash from multiple Long Island bank locations, traveled to the island of St. Maarten, and purchased approximately two kilograms of cocaine from a Jamaican man. In late September 2012, defendant provided the cocaine to two female couriers, who transported it from St. Maarten to Florida on a cruise ship. Defendant then retrieved the cocaine from the couriers in Florida and, in early October 2012, transported approximately one kilogram to Long Island for the purpose of selling it, while he left approximately one kilogram in a storage facility in Florida.

The government anticipates calling three cooperating witnesses to testify regarding the charged conspiracy. One of the cooperating witnesses ("CW-1") operated as a confidential source for the government during the charged conspiracy by recording phone calls with the defendant and providing the government with information regarding the defendant's efforts to purchase and distribute cocaine. A second cooperating witness ("CW-2") was one of the defendant's co-conspirators during the charged conspiracy. The defendant contacted CW-2 and another individual ("Individual-1") on October 2, 2012 to ask if they were interested in purchasing cocaine. Later that day, CW-2 and Individual-1 traveled from New Jersey to Long Island along with a third individual for the purpose of purchasing the cocaine. The third cooperating witness ("CW-3") was also one of the defendant's co-conspirators during the charged conspiracy. At the defendant's request, he recruited one of the couriers, accompanied the defendant to the Caribbean to meet the couriers' cruise ship, and attempted to facilitate the sale of cocaine to another individual on Long Island. The defendant agreed to pay CW-3 for his assistance trafficking the drugs.

II.     Evidence of Narcotics Trafficking Prior to the Charged Conspiracy

In addition to their expected testimony about the defendant's criminal conduct during the charged conspiracy, CW-1 and CW-2 are expected to testify about the defendant's narcotics-trafficking activities prior to the start date of the charged conspiracy. Such evidence is admissible as direct evidence of the charged conspiracy because it is inextricably intertwined with and necessary to complete the story of that offense. In the alterative, the evidence is admissible pursuant to Rule 404(b), as crimes, wrongs, or other acts that establish the defendant's knowledge, intent, motive, and plan in connection with the charged conspiracy.

A.      The Defendant's Prior Narcotics Trafficking

CW-1 is expected to testify that, from February to August 2011, before he began cooperating with the government, he and the defendant traveled to California on five separate occasions to purchase marijuana for the purpose of reselling it on Long Island. In total, CW-1 and the defendant purchased approximately 115 to 130 kilograms of marijuana in California. Prior to each trip, the defendant withdrew large amounts of cash from multiple bank locations, and the defendant carried the cash with him to California in his suitcase. Following the first three trips, a trucking company, which the defendant paid to transport the marijuana, successfully delivered the drugs to them on Long Island. CW-1 and the defendant

then resold it from various places on Long Island, including a house on Townline Road in Hauppauge, New York. While selling the marijuana, CW-1 and the defendant stored some of the marijuana in a storage facility on Long Island. Following the fourth trip, in May 2011, Pennsylvania State Police Department ("PSPD") officers stopped the truck transporting the marijuana while it was en route to Long Island, and the PSPD officers seized the drugs. This seizure resulted in a significant financial loss for the defendant. (A redacted copy of a PSPD report detailing the Pennsylvania incident is attached hereto as Exhibit 1.) On the fifth trip, in August 2011, CW-1 and the defendant attempted to drive the marijuana from California to New York themselves. The defendant purchased two vehicles in California for that purpose; he drove one vehicle and CW-1 drove the other. While traveling through Ohio, Westlake Police Department ("WPD") officers stopped CW-1's car, seized the marijuana, and arrested CW-1. The defendant escaped from Ohio before WPD officers could locate him, but again suffered a significant financial loss. CW-1 admitted to WPD officers that he and the defendant had been trafficking marijuana from California to New York. Subsequently, WPD officers contacted Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") Robert Stueber, who had been investigating the defendant's drug-trafficking activities in Long Island. After meeting with TFO Stueber, CW-1 agreed to cooperate with the government. (A redacted copy of a WPD report detailing the Ohio incident is attached hereto as Exhibit 2.)[1]

CW-1 is also expected to testify that, in October 2011, he and the defendant traveled to Puerto Rico together and attempted to transport approximately 250 grams of cocaine back to the continental United States. After traveling from Florida to Puerto Rico, the defendant took CW-1 to a motel room and showed him 250 grams of cocaine that he had hidden there. The defendant explained, in sum and substance, that he had met a Jamaican man in St. Maarten from whom he purchased approximately two kilograms of cocaine for $8,000 each. He also stated, in sum and substance, that he had already transported a kilogram of cocaine to the continental United States and that he had hidden the remaining 750 grams in a storage facility in St. Maarten. The defendant then demanded that CW-1 assist him in transporting the 250 grams of cocaine by concealing it in his groin area and carrying it on a flight to the continental United States. CW-1 agreed. He feared that he would disclose his cooperation with the government if he did not comply.[2] On their way to

---

[1] CW-1 was issued a traffic citation and released from WPD custody.

[2] CW-1 also is prepared to testify that he believed the defendant would become violent towards him if he declined to carry the drugs. Indeed, CW-1 knew that the defendant had attacked individuals who owed him money in 2007 and 2008 and that the defendant knew violent individuals who would attack someone for money. The government does not intend to elicit this testimony on direct examination of CW-1, but submits that this is a proper subject for re-direct should the defendant "open[] the door" to it on cross-examination. United States v. Diaz, 176 F.3d 52, 80 (2d Cir. 1999) (holding district court properly admitted cooperating witness's testimony on re-direct that she was scared of defendant because cross-examination created false impression about purpose for which she took government-funded trip).

3

the airport, officers from the United States Bureau of Customs and Border Patrol ("CBP") stopped their vehicle and discovered the cocaine hidden in CW-1's groin area. The CBP officers arrested CW-1 and the defendant. (Redacted copies of CBP and DEA reports detailing the Puerto Rico incident are attached hereto as Exhibit 3.)[3]

CW-1 is further expected to testify that, in April and May 2012, he recorded four phone calls in which the defendant discussed his continued plans to engage in marijuana trafficking, his plot to smuggle cocaine from Colombia, and his lack of money as motivation to purchase and sell narcotics. The government intends to offer excerpts of these calls at trial (attached hereto as Exhibits 4, 5, 6, and 7). Relevant portions of the calls include the following statements:

- On April 12, 2012, during a consensually recorded phone call that began at 3:42 p.m., the defendant stated, in sum and substance, that he intended to withdraw $20,000 to $30,000 before a trip he was planning to take with CW-1 and that he would withdraw another $20,000 to $30,000 when they arrived at their destination. Defendant further stated, in sum and substance, that he had gone to the "shop" and discussed having three compartments built in his car that could hold between twenty and twenty-seven pounds of marijuana.

- On May 7, 2012, during a consensually recorded phone call that began at 3:11 p.m., the defendant stated, in sum and substance, that he would have fled to Colombia if he had been found guilty of drug trafficking in Puerto Rico. He further stated, in sum and substance, that he did not want to be broke during the summer, but that he was unwilling to get a new job and work ten hours per day to make money over the summer.

- On May 7, 2012, during a consensually recorded phone call that began at 3:46 p.m., the defendant stated, in sum and substance, that in two weeks he and CW-1 would have money and they would "be able to do [their] thing." He further stated, in sum and substance, that he could fit thirty to thirty-five pounds of marijuana in "that spot" and that thirty pounds of the drug would cost approximately $75,000.

- On May 8, 2012, during a consensually recorded phone call that began at 1:03 a.m., the defendant stated, in sum and substance, that he "need[ed] fucking money" and that he "need[ed] to do something like in the next 30 days" so that he would "have new money." He further stated, in sum and substance, that he "might end up fucking grabbing a ticket, going back down to Colombia, and fucking filling up [his] belly." The government submits that this latter statement

---

[3] CW-1 was not acting at the direction of law enforcement during the Puerto Rico trip. Following his arrest, he pleaded guilty to a drug possession charge and received a deferred sentence. His conviction was expunged after his successful completion of a probationary period. The charges against the defendant in Puerto Rico ultimately were dismissed.

refers to the defendant's intention to travel to Colombia and swallow packages of cocaine for the purpose of smuggling them into the United States.

CW-2 is expected to testify that, in 2011, she assisted the defendant with the sale of small amounts of marijuana on three occasions. On one occasion, she brought Individual-1 with her to the house on Townline Road to purchase marijuana.

B.  Direct Evidence

Although the above-described criminal conduct precedes the start date of the charged conspiracy, the government respectfully submits that such evidence is admissible as direct evidence of the nature of the defendant's relationship with CW-1, CW-2, and other co-conspirators. Evidence of uncharged criminal activity is not considered "other crimes" evidence under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); accord United States v. Reed, --- Fed. Appx. ----, 2014 WL 4179871, at *1 (2d Cir. Aug. 25, 2014). In addition, the Second Circuit has explained that, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997). Accordingly, "[r]elevant evidence is not confined to that which directly establishes an element of the crime." Id.; see also Fed. R. Evid. 401, 402. Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

Here, CW-1's expected testimony regarding the 2011 trips to California, the October 2011 trip to Puerto Rico, and the consensually recorded phone calls in April and May 2012 is evidence that is inextricably intertwined with and necessary to complete the story of the charged crimes. That evidence provides the story's essential early chapters, during which the defendant and CW-1 formed a criminal relationship and engaged in illicit activity together. It provides context for CW-1's decision to cooperate with the government, and it demonstrates that the defendant continued to place significant trust in CW-1 after he started cooperating. This evidence is necessary to explain to the jury why the defendant was willing to explicitly discuss the charged crimes with CW-1 during consensually recorded phone conversations that took place in September 2012. See United States v. Kalaydjian, 784 F.2d 53, 56 n.3 (2d Cir. 1986) (evidence of defendant's prior meeting with cooperating witness, at which plan to purchase heroin was discussed, was properly admitted "to establish the basis of the trust relationship between [cooperating witness] and [defendant]"); United States v. Harris, 733 F.2d 994, 1006–07 (2d Cir. 1984) (permissible for trial court to admit evidence of defendant's prior narcotics dealings with informant which "tended to show the basis for [defendant's] trust of [informant]"); see also, e.g., United States v. Talley, 164 F.3d 989, 1000 (6th Cir. 1999) (statements made by informant in tape-recorded conversation with

5

defendant, including that informant and defendant had sold drugs together at one point, were properly admitted because they "established [defendant's] and [informant's] long term relationship" and helped explain why defendant would solicit informant to commit murder).

Moreover, CW-1's and CW-2's expected testimony provides important background information for the charged conspiracy. In particular, CW-1's expected testimony regarding the October 2011 Puerto Rico trip shows how the relationship developed between the defendant and the Jamaican man on St. Maarten from whom he purchased the cocaine in September 2012. CW-1's expected testimony about the defendant's failed drug-trafficking trips in 2011 sheds light on the defendant's motives for recruiting co-conspirators to smuggle the cocaine from St. Maarten to the United States, rather than risking detection by law enforcement himself. CW-2's expected testimony that she and Individual-1 participated in drug transactions with the defendant in 2011 provides the context necessary to understand why the defendant attempted to sell cocaine to them on October 2, 2012. See, e.g., United States v. Guang, 511 F.3d 110, 121 (2d Cir. 2007) (holding evidence of other acts admissible to "enable the jury to understand how the illegal relationship between the co-conspirators developed" (internal quotation marks omitted)); United States v. Pipola, 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case.")

Accordingly, the evidence at issue is admissible as direct evidence of the charged conspiracy.

C. Rule 404(b)

CW-1's and CW-2's expected testimony also is admissible under Federal Rule of Evidence 404(b). Evidence of a defendant's other acts is admissible under Rule 404(b) if relevant to an issue at trial other than the defendant's character—such as proving motive, intent, preparation, plan, knowledge, absence of mistake, or lack of accident, see Fed. R. Evid. 404(b)(2)—and if its probative value is not substantially outweighed by the risk of unfair prejudice. See United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000). The Second Circuit follows an "inclusionary approach," which admits all relevant "other act" evidence that does not serve the sole purpose of showing the defendant's bad character and that is not overly prejudicial. United States v. Moran-Toala, 726 F.3d 334, 345 (2d Cir. 2013) (internal quotation marks omitted).

In this case, CW-1's and CW-2's expected testimony is evidence of the defendant's knowledge and intent. Indeed, the defendant's previous involvement in the drug-trafficking trade indicates that he knowingly transported cocaine in September and October 2012 and intended to distribute that cocaine. See United States v. Paulino, 445 F.3d 211, 221–23 (2d Cir. 2006) (holding that, because defendant disputed knowledge and intent elements of narcotics-distribution charge, his prior drug conviction was admissible under Rule 404(b) as evidence of those elements); United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) (concluding that, where knowledge and intent were at issue, "evidence of

6

[defendants'] involvement in prior narcotics transactions was probative of their intent or knowledge in connection with [charged narcotics-distribution conspiracy]").

Furthermore, CW-1's expected testimony is admissible to establish the defendant's motive for committing the charged offenses. The defendant's failed attempts in 2011 to smuggle marijuana from California and cocaine from Puerto Rico resulted in a significant financial loss for the defendant. Those failed attempts, along with the consensually recorded phone calls in April and May 2012, in which the defendant discusses his need for money and desire to engage in narcotics-trafficking in the immediate future, demonstrate that the defendant's poor financial condition motivated him to commit the charged offenses. See United States v. Romero-Padilla, 583 F.3d 126, 131 (2d Cir. 2009) (per curiam) (concluding evidence of previous plans to import narcotics was admissible because it indicated defendant's participation in charged conspiracy "was at least in part motivated by his desire to acquire the funds necessary to complete . . . other contemplated transactions"); United States v. LaFlam, 369 F.3d 153, 156 (2d Cir. 2004) (holding evidence of uncharged drug use admissible to "demonstrate a motive—to pay off existing drug debts and to purchase more drugs—to commit the charged robberies").

CW-1's expected testimony also demonstrates that the defendant engaged in a common plan or scheme when trafficking narcotics. The 2011 California trips and the April 12, 2012 consensually recorded call evidence such a plan, insofar as they reflect defendant's pattern of withdrawing large amounts of cash from multiple bank locations prior to each narcotics-trafficking trip and using a storage facility to store the purchased narcotics. Defendant repeated this process with respect to the cocaine purchased in St. Maarten during the charged conspiracy. The October 2011 Puerto Rico trip provides even stronger evidence that defendant acted pursuant to a common plan. During that trip, the defendant purchased cocaine from the same source on St. Maarten and used the same method to transport the drugs (i.e., couriers) as he did during the charged conspiracy. Moreover, he stored some of the purchased cocaine in a storage facility—the same tactic he used with respect to the cocaine he purchased in September 2012. See United States v. Robinson, 635 F.2d 981, 987 (2d Cir. 1980) (stating that proof of defendant's "participation in other similar narcotics operations, close in time and involving use of identical methods" was properly admitted as evidence of a common plan).[4]

---

[4] Each of the April and May 2012 consensually recorded phone calls refers, directly or indirectly, to the defendant's use of loans to finance his drug transactions. If asked about these loans, the government anticipates that CW-1 would testify that the defendant obtained them through fraudulent means. The government does not anticipate inquiring on direct examination of CW-1 into the fraudulent nature of the loans that the defendant used to purchase narcotics. To the extent that this information is elicited on cross-examination or re-direct, however, the government notes that it is admissible pursuant to Rule 404(b) because it demonstrates that the defendant engaged in a common plan or scheme when trafficking narcotics. Indeed, if asked, the government anticipates that CW-1 would testify that the defendant used money obtained through a fraudulent loan to purchase the cocaine during the charged conspiracy, just as he used fraudulent loan money to purchase

7

Where, as here, evidence of narcotics-trafficking activity prior to the start date of the charged offense is admissible pursuant to Rule 404(b), it nonetheless may be excluded under Federal Rule of Evidence 403 if its probative value is substantially outweighed by a danger of unfair prejudice. Evidence admitted pursuant to Rule 404(b) should not be excluded on grounds of unfair prejudice, however, when the evidence does not "involve conduct more inflammatory than the charged crime." Paulino, 445 F.3d at 223 (internal quotation marks omitted). Thus, where the uncharged crimes are similar in nature to the charged crimes, Rule 404(b) evidence is generally admissible under the Rule 403 balancing test. See, e.g., id.; United States v. Livoti, 196 F.3d 322, 326 (2d Cir. 1999).

The probative value of CW-1's and CW-2's expected testimony is not outweighed, much less substantially outweighed, by the risk of unfair prejudice, as the evidence concerns conduct substantially similar to that involved in the charged offenses. Indeed, the charged offenses, which involve approximately two kilograms of cocaine, are as serious as the October 2011 Puerto Rico trip, which also involved approximately two kilograms of cocaine, and more serious than the defendant's 2011 California trips, which involved approximately 115–130 kilograms of marijuana. See U.S.S.G. §§ 2D1.1(a)(5), 2D1.1(c)(6)–(7) (assigning a base offense level of 28 to offenses involving at least two kilograms but less than 3.5 kilograms of cocaine, but a base offense level of 26 to offenses involving at least 100 kilograms but less than 400 kilograms of marijuana). The planned narcotics-trafficking activities discussed on the recorded phone calls in April and May 2012—during which the defendant stated that he planned to have compartments built in his car to hold up to 35 pounds of marijuana and to swallow cocaine in Colombia for the purpose of smuggling it into the United States—involved less drugs than the defendant's 2011 trips. CW-2's expected testimony about the 2011 marijuana transactions in which she participated involves even lesser amounts.

Accordingly, the above-described evidence is admissible pursuant to Federal Rule of Evidence 404(b).

III.   Consensually Recorded Phone Calls during the Charged Conspiracy

The government also respectfully requests that the court rule on the admissibility of excerpts from three consensually recorded phone calls between the defendant and CW-1 in September 2012 (attached hereto as Exhibits 8, 9, and 10). During these calls, the defendant discussed purchasing, selling, and transporting cocaine. Relevant portions of the calls include the following statements:

---

marijuana during the 2011 trips to California. See Robinson, 635 F.2d at 987. Moreover, to the extent the defendant testifies at trial, the government intends to cross-examine him regarding his fraudulent loan activity. See Fed. R. Evid. 608(b).

8

- On September 4, 2012, during a consensually recorded phone call that began at 7:05 p.m., the defendant stated, in sum and substance, that he had purchased one kilogram of cocaine, but he was still trying to purchase a second kilogram of cocaine.

- On September 10, 2012, during a consensually recorded phone call that began at 12:32 p.m., the defendant stated, in sum and substance, that he was not currently in Florida, he had been gone for eight days, and he wanted CW-1 to take a cruise with him from September 15 to 23, 2012. He further stated, in sum and substance, that he planned to book cruise tickets for the "girls," but he did not want to put their tickets on his credit card; rather, he wanted to determine if they could purchase the tickets using their bank accounts or if he could purchase the tickets using American Express gift cards. The government submits that this conversation occurred while the defendant was on a trip outside of the United States, during which he purchased approximately two kilograms of cocaine, and that the conversation reflects the defendant's plan to have two female couriers transport the cocaine from St. Maarten to the United States aboard a cruise chip.

- On September 30, 2012, during a consensually recorded phone call that began at 1:22 p.m., the defendant stated, in sum and substance, that the cocaine in his possession was "fire," CW-1 should broker a deal for the sale of one kilogram of cocaine, and he wanted $40,000 out of the $42,000 they expected to make from that sale. The government submits that the defendant used the term "fire" to signify that the cocaine was of high-quality. The defendant further stated, in sum and substance, that he was in possession of two kilograms of cocaine and that he intended to break down the second kilogram into smaller portions for sale, so that he could make more money than on the sale of the first kilogram.

The above-described statements are direct evidence of the charged conspiracy, and they do not present any hearsay concerns, as they are admissions by a party opponent, see Fed. R. Evid. 801(d)(2)(A). These statements thus are admissible.

IV.   Calls and Text Messages Recorded Pursuant to a State Court-Authorized Wiretap

At trial, the government intends to introduce a series of text messages and two phone calls between CW-3 and a co-conspirator named Thomas Forken that were intercepted pursuant to a state court-authorized wiretap of Forken's phone (attached hereto as Exhibits 11, 12, and 13). The Honorable James Hudson of the Suffolk County Court issued an order authorizing the wiretap on September 28, 2012. The calls and text messages were intercepted during the charged conspiracy, on October 1 and 2, 2012. During these recorded conversations, CW-3 discussed the defendant's transportation of the cocaine from Miami to Long Island, and he attempted to broker a sale of that cocaine to Forken.

9

In particular, on October 1, 2012, Forken and CW-3 exchanged text messages between 7:10 a.m. and 9:35 a.m. In one text message, CW-3 stated: "My right hand should be heading in from MIA with a whole flock of girls like the girls we saw in Harlem. FUEGO!!!" The government submits that "right hand" refers to the defendant, "a whole flock of girls" refers to a kilogram of cocaine, and "FUEGO" refers to the high quality of the cocaine. Forken then stated: "No[ ]dou[b]t hope they young bitches." In response, CW-3 states: "They are 42." The government submits that Forken's statement is an inquiry into the price of the cocaine and CW-3's response indicates that one kilogram costs $42,000. CW-3 further stated, in sum and substance, that the cocaine would be sold by Tuesday, i.e., the following day, the defendant was about to leave Miami with the cocaine, and the defendant would arrive on Long Island in 24 hours.

The next day, on October 2, 2012, CW-3 and Forken exchanged a series of text messages between 10:26 a.m. and 3:55 p.m. In those text messages, CW-3 and Forken agreed, in sum and substance, to meet the defendant at 4 p.m. at Branchinelli's restaurant in Hauppauge, New York, so that Forken could purchase the cocaine.

That meeting was confirmed during a recorded phone call between CW-3 and Forken, which occurred on October 2, 2012 at 1:44 p.m. During this call, CW-3 stated, in sum and substance, that the cocaine belonged to the "Romanian kid" that "[he] grew up with" and that Forken should meet them at 4 p.m. to sample the cocaine before purchasing it. The government submits that CW-3 referred to the defendant, who is of Romanian descent, as the "Romanian kid" during this call.

A second call between CW-3 and Forken took place on October 2, 2012 at 5:09 p.m. During this call, CW-3 stated, in sum and substance, that the defendant still had not shown up to the meeting and that he would wait five more minutes. Forken stated, in sum and substance, that he was still interested in purchasing the cocaine.

The above-described statements are direct evidence of the charged conspiracy, and they do not present any hearsay concerns, as they are co-conspirator statements made during and in furtherance of the charged conspiracy, see Fed. R. Evid. 801(d)(2)(E). Accordingly, the statements are admissible.

10

V.   Jail Calls

The government also respectfully requests the court to rule on the admissibility of excerpts of three of the defendant's consensually recorded jailhouse telephone calls lawfully obtained by the government (attached hereto as Exhibits 14, 15, 16, and 17). These excerpts, which will not disclose the defendant's pretrial incarceration, constitute admissions made by the defendant regarding the conspiracy charged in the superseding indictment and statements made by co-conspirators during and in furtherance of that conspiracy.[5]

Specifically, during a consensually recorded phone conversation with CW-3, which began on October 3, 2012 at 7:15 p.m., the defendant stated: "The phone I had, um, I don't have it anymore. It's not in my possession." The government submits that this statement is an effort by the defendant to inform CW-3 that the government is in possession of incriminating evidence contained on the defendant's iPhone. Additionally, the defendant stated on this call: "[A]pparently they, you know, they went to my hotel and they found, uh, drugs in my room, and I'm done. Yeah, I'm done." The government submits that this statement reflects the defendant's consciousness of guilt of the charged crimes.

On October 9, 2012 at 9:21 p.m., during another consensually recorded jail call with CW-3, the defendant stated, in sum and substance, that "Emilio" was a confidential informant who told the government that the defendant intended to flee if he were ever arrested. The government submits that this statement evidences the defendant's consciousness of guilt of the charged crimes. The defendant further stated, in sum and substance, that Emilio had been a confidential informant "the whole time." The government submits that the defendant's statement refers to the timeframe during which he trafficked narcotics and thus constitutes a general admission to the charged crimes.

During a consensually recorded jail call with CW-2, which began on October 26, 2012 at 6:09 p.m., the defendant stated, in sum and substance, that he was willing to reveal incriminating information to the government regarding additional co-conspirators in order to receive a reduced sentence. The government submits that defendant's statements constitute a general admission to the charged crimes.

In a later consensually recorded jail call with CW-2, which began on October 27, 2012 at 8:16 p.m., the defendant and CW-2 discussed, in sum and substance, changing the password to the defendant's iPhone and the defendant's request that CW-2 contact a

---

[5] Although the excerpts do not disclose the defendant's pretrial incarceration, because the defendant has declined to stipulate to the authenticity of the jail calls, the government may be required to call a records custodian from the Nassau County Correctional Center to testify at trial. Thus, the government may be unable to prevent the jury from learning of the defendant's pretrial incarceration.

11

storage facility on his behalf. The government submits that the defendant and CW-2 were discussing the defendant's efforts to conceal evidence of the charged conspiracy.

Neither the defendant's nor the co-conspirator's statements described above present any hearsay concerns. See Fed. R. Evid. 801(d)(2)(A), (E). Moreover, as these statements were made during lawfully intercepted and consensually recorded jail calls, they are admissible. See United States v. Willoughby, 860 F.2d 15, 19–20 (2d Cir. 1988).

VI. Conclusion

For the reasons set forth above, the government respectfully moves to admit the defendant's narcotics-trafficking activity prior to the start date of the charged conspiracy as direct evidence of the charged offenses or, pursuant to Rule 404(b) of the Federal Rules of Evidence, as evidence of the defendant's knowledge, intent, motive, and plan in connection with the charged conspiracy. The government also moves to admit excerpts of consensually recorded phone calls with the defendant during the charged conspiracy and the defendant's consensually recorded jailhouse phone calls, as well as calls and text messages intercepted pursuant to a state court-authorized wiretap, which reflect the defendant's admissions and statements by his co-conspirators during and in furtherance of the charged conspiracy.

    Very truly yours,

    LORETTA E. LYNCH
    United States Attorney

By:   /s/ Michael P. Robotti
    Michael P. Robotti
    Assistant U.S. Attorneys
    (718) 254-7576

cc:   Clerk of the Court (SJF) (by ECF)
      Kevin Keating, Esq. (by ECF)